Okay, our last case for today is Palacio v. U.S. Food and Drug Administration, Mr. Feldman. That's correct, your honors. Andrew Feldman on behalf of Jessica Palacio. We filed our opening brief and we addressed several different issues, but I'm going to cut right to it, your honors. The FDA exceeded its authority when it issued a lifetime ban, permanent debarment to Jessica Palacio based on a statement that Jessica Palacio made to the FDA investigator in April of 2017 that she had personally screened a subject as part of what's called the vestry study into the drug adverdiscus based on conduct relating to the approval or development of that drug. A false statement for which she was convicted, right? Correct, your honor. Yeah, and the real question is, was her conduct relating to the development or approval, including the process for development or approval of any drug product? Now, relate to has a broad meaning. Having a connection with or reference to, it seems to me the ordinary meaning of that is quite broad. And this relates to it, it does not relate to it, your honor. It's and if we look at any of the different terms that your honor has put forth, let's talk about whether it relates to the process, well, relates to the process or in connection with the process of developing or approving a drug adver. First, the vestry study terminated in November of 2015. We're talking about in a statement that's made April of 2017, okay? The vestry study was not for the approval of a drug. It was not for the development of a drug. This drug existed on the market in 2011 through a NDA or National Drug Approval. So it's not within the plain language of developing or approving a drug. So it was approved for four to 11 year olds, six years before the FDA ever asked Jessica Palacio a single question. It was part of a post-market study and GSK, the sponsor, even touted how it had reached its primary endpoint in 2016. Well, I know we're here to parse through the meaning of the phrase relating to, but your comments make me think about relating back. And it seems like the statements related back to everything you just discussed in terms of the vestry study. So even though, so why does when she made the statement matter for purposes of when she engaged in the conduct? Well, I mean, we spelled this out in our brief, then you have sort of an absurdity issue. Then you have a limitless application of the words relating to. She could make the statement 25 years later when the FDA not going to do it. There's nothing absurd for Congress to write a statute like this in very broad language that allows the department to relate back in the way that Judge Abudu just asked about. There's nothing absurd about that.  But the full, well, you may think that that's, you know, really broad, but Congress used really broad language.  Relating to is broad. There's no dispute in association with relating to in connection with, but it's not like a Scrivener's error. I mean, if you want to make an absurdity argument, you've got to, you've got to say, you know, this is monstrous. It makes no sense. It makes sense to me. Well, if the study is terminated in November 2015, your honor, respectfully, and the drug has already been approved six years later before the statements even made, then how is a statement in 2017, years after, going to relate to the development or approval of this drug? Well, I just don't, I don't see that, and I see that as a problem of potential absurdity if you push out the limit of when the statement could be made to 25 years, as I always say. Find out that there's somebody who's been certified and, and they've, they've made a false statement, uh, we're, we're in. I mean, I respectfully disagree, your honor. She, the, the statement, the conduct is a false statement to an FDA investigator, right? It's the statement, the falsity of the statement that makes it the conviction that unfortunately was rendered during jury trial in 2022, of which I was a part. But yeah, but it, it, the statement is the conduct. The statement is the conduct. And the statement relates to work that she had done in developing that product. Isn't that right? That's incorrect, your honor. That was, it was a statement made after this study had completely terminated, right? In November of 2015. Now we're in April. Yeah, but it's about, it's a statement about what she had done earlier, right? It's a statement about what she had done earlier and whether or not she had screened a patient called D.H. Who she had not, who she had not screened. That's what the jury found. Yes, your honor. And that's what her conviction is based on. Right. So, but that statement, I screened D.H. during this, this clinical trial study, does not relate to work that she done, did in connection with, relating to the development or approval of that drug. That drug was already developed. So then what was the point of the clinical trial? What was the point then of the clinical trial, right? Because you're saying that she's engaged in developing research for a drug that was already approved, but the company is engaging in the critical, the clinical trials for purposes of advancing, modifying, eliminating, whatever, the drug. So I, and I read your brief, so I appreciate your reference to that. I'm, I'm telling you, it's not adding up. Well, I'm going to answer your honor's question, which is that the, the purpose of the clinical trial was to assess the safety and the effectiveness of an approved drug in 2011, which had been approved for the population of four to 11 year olds in 2011. And to see whether or not doing a certain amount of sprays each day in combination with corticosteroids was, was something that would increase or decrease its effectiveness, right? So it was related to the drug, even though the drug was already on the market or had been approved, her behavior was still related to a, to a drug. Of course. It's still related to a drug. It's a, it's part of a clinical trial. It'd have to be related to a drug, but it's not related to the approval or development of a drug. Development. Why? Okay. Yeah.  So what is the definition for you of development? Create or produce. Okay. So then what was the point of the clinical trial? To assess the effectiveness and safety of the drug. It had nothing to do with- And so if they found out she provides false information regarding a patient that could have led to approval or advancement of a drug, and you're still saying that doesn't satisfy the language? Well, I'm, we're, we're adding facts that just are, that's not what, that was not what the purpose of the study was, though. And so that's my question. What was the purpose of the study? The purpose of the study was to assess the safety and effectiveness of the drug. Okay. But it wasn't to advance the drug. So if she lied, let's say she lied, she admitted, well, she was convicted. Yes, Your Honor. And her comments could have led to, you know, improvements or changes to the drug, but you're still saying that this 2011 approval is all that matters in anything in terms of the clinical trials is still not related to the drug? Again, maybe I'm not fully understanding. I just, I'm not clear on why- When they, when they talk about approval of a drug product in the FDA context, it has a pretty distinct meaning, always. It's just to approve a drug. The drug has to be on the market, has to go through this process. This is a post-market study. It's been on the market for five to six years.  What does develop mean? Develop means to- Right. It's approval and development. Right. It doesn't have to have independent meaning. They're not synonyms. It sure does, Your Honor. It means to create or produce. So if you take- Now that, well, that creating or producing would be different from developing, wouldn't it? I mean, development could be, as Judge Abudu was saying, improving it, changing it, right? It could be a lot of things that are beyond creation. I think that when you look, I think it's create or produce. That's the definition that I would say too. But if you're talking about improving a drug, even using that definition- Establishing that it has other uses or whatever. I mean, it could be, it has to be more than just create. Establishing that it has other uses or improving it. When I develop something, I'm adding to it. I'm doing something beyond something that's already been created. Okay. Well, if we are establishing other uses, if you're going with Your Honor's definition, that's not what the purpose of the specific study was. So her statement couldn't relate to development in that context. If you're looking at improving the drug, I would say the same thing, that it's not related to, this study was not related to that. The study was related to assessing the safety and effectiveness of an already approved drug- Okay. You've saved five minutes. Let's hear from the government. Mr. Patel? Good morning, Your Honors. And may it please the court, Urja Mithal for the government. Congress enacted the debarment statute to protect the integrity of drug development and approval. Petitioner was convicted of making a material false statement to an FDA investigator that she had screened a child for participation in a clinical drug trial when that child had never in fact participated in that trial. Lying to federal investigators under oath about a drug trial- What's the point of the trial? The trial, it's my understanding that FDA and the company were, there were questions about the safety and efficacy of this drug for children between the ages of 4 and 11. And so GlaxoSmithKline was assessing the safety and efficacy of the drug for that population in response to inquiries from FDA. And that was the purpose of the trial. And that's, as Your Honor explained earlier, clearly conduct, that's clearly related to the development or approval of the drug, false statement- Or at least relating to the process for it. Or at least related to the process for it, yes, Your Honor. I mean, that entire phrase in the statute, as Your Honor identified, is written broadly. Congress wrote it capaciously to cover all these different parts and aspects of drug development and approval. And so the statement in the affidavit that she swore to was conduct related to drug development or approval. The FDA inspection itself is part of that process. The statement and the conduct had everything to do with drug development or approval. And it's at the core of the kind of conduct that Congress determined should preclude an individual like Petitioner from participating in providing services to such entities in the future. Can I ask you to address a hypothetical question? So let's say someone is coming back into the country. This is my hypothetical. Someone's coming back in the country, and they go through some screening, and they've like some pills or something. And the customs officer asks, are these FDA approved? And they say yes. And it turns out that's a lie, that they're not FDA approved. And they're prosecuted for that, for lying to a customs officer. Would they be caught up by this statute? I think, Your Honor, a hypothetical like that, you would probably first need more facts related to sort of what the nature of the conviction was, and to what extent that constitutes conduct relating to the development or approval. I guess that's my point. It seems like under your reading of the statute, that in and of itself would be enough. Because that's a lie about the approval of any drug, right? It seems the way you're reading that statute, that would fit under it. If there's a federal criminal provision for which the person is convicted, it wouldn't necessarily be a material false statement under 1001. I think 1005. No, no, no. It would be the conviction would be. OK. So you're saying there's some limitation that I'm not aware of. What's the limitation? A couple of limitations. First, you would need a federal criminal conviction. Yeah, there is one. Because it's illegal to lie to a customs officer. Sure, yeah. And then you would need facts related to determine sort of the nature of the relationship to development or approval. And then I guess the last point. The development of approval relationship would be that the lie was about the approval of the drugs. Right. So just one sort of last point here is I do think your honors identified that there are harder cases at the margins that sort of go to the tightness of the relationship. How is that on the margin? I mean, the TSA officer isn't the FDA. They're just asking what the FDA has already done. And perhaps the fact you're talking about is whether or not they were involved in the approval of it. But that's not the issue in that hypothetical either. I guess I'm looking at. Well, so first, to answer Judge Brasher's question, what is your final answer? I mean, to the extent, like I said, if the fact says this person has no relationship to the development or approval of the drug, it's outside the scope of the statute, as your honor posited. If this person, if there are questions about that, that would be. I mean, it's a pretty broadly worded statute, right? Convicted of a felony under federal law for conduct relating to, you've been arguing. I agree with you. And we've said before, relating to is very broad. Yes, your honor. And I think. Relates to the approval of a drug. It might well be that the answer to Judge Brasher's question is, it's not a case that we have before us is, yeah, they could debar that individual. That's right, your honor. And I think for all the reasons that I think that hypothetical might be tough, which is it's a question about how tightly related the conduct underlying the conviction needs to be to development or approval, this case is a straightforward one. I mean, this is, this case. That's the reason I asked the hypothetical, is it just seems like your arguments are, and I mean, I guess relating to is broad, but I'm trying to figure out, like, is there any limitation? Like this case, I think the defendant's argument, or not the defendant here, but I guess the petitioner's argument, the petitioner's argument seems to be, look, the line must be drawn at, sort of the crime must be committed during the participation of the approval process, and relating to seems broader than that. But it does seem like there should be some, some limitation on relating to, right? That's right, your honor. I mean, I think both you and Chief Judge Pryor make good points that relating to is broad. There are some limits. I think there are going to be harder questions at the margins. I just don't think this is that case. I mean, this conduct had everything to do with drug development and approval, as we've talked about. There's no time limitation in the statute. Congress didn't write any requirement that there be any causal effect related to the, between the conviction and what FDA does. So relating to provision is broad enough to cover this particular fact pattern. Nor is there a temporal limit. That's right, your honor. And so I think both of your observations are correct, that the phrase is broad, that there will be convictions that have to do with drug products, or statements about drug products that would fall outside the statute, hypotheticals you can imagine, whether that individual was involved with drug development or approval and lied about it. Whether, you know, I can imagine all sorts of sort of details about that hypothetical that might put FDA in a position to adjudicate how tightly related that conduct is to drug development or approval, or this court in a position to adjudicate that question. But this is sort of, as you've observed, a straightforward one. What's the standard of review for us here? I think the question of whether the conduct is related to development or approval is a legal question, and therefore, de novo before this court. And so that's sort of what I was getting at there, is that there are other hypothetical fact patterns where this court might be forced to, or required to adjudicate the sort of bounds of that, what relating to means and covers. But this one clearly is related to. So perhaps it's not the relating to phrase that's the problem. It's really the definition of development or approval. And if we follow Ms. Palacio's reasoning, the drug was already approved. So that part of the development or approved doesn't apply. So it seems we're focusing on the development. And if the clinical trial where she made this false statement was just an evaluation of whether we should do anything with the drug, then perhaps there is some credence to Ms. Palacio's position. Why would participation in the clinical trial constitute the development of a drug, especially if there was no change made to the drug? So a couple of points, Your Honor. First, the conduct for which she was convicted is the false statement that she made under oath to the FDA investigators. And so that conduct related to the development or approval of a drug in two ways. One, it's a statement about the fraudulent scheme that had been conducted where these pediatric subjects were said to have participated in the study when they hadn't. So in that sense, it related to drug development or approval. And the FDA inspection itself is part of the drug development or approval process because it's how FDA goes about determining the integrity of the data that it's receiving from drug sponsors and from clinical trial companies for both that particular drug and for other drug products for which they might be receiving data from those sponsors and those organizations. And so, you know, you can't really take— The drug sponsor terminates the clinical trial, right? And alerts the FDA to the irregularities in the data. That's how this unfolded, right? That's how this unfolded. It's one of these scenarios where the scheme was sort of— It's kind of always going to be an after-the-fact situation, right? It's often going to be an after-the-fact situation, and that's why Congress enacted this prophylactic statute to say, look, FDA can't always know the integrity of the data before it. And so when it does find out that there are individuals who have been convicted of felonies relating to drug development or approval, those individuals will be mandatorily debarred from participation in the future because Congress won't— I mean, FDA won't always know whether the data it's receiving from these drug sponsors is sort of the quality of that data. And so it does the best it can. But to your other question about development or approval, I think it's— The conduct here was related to development or approval both because it was part— A false statement made to federal investigators in a federal investigation about the quality of that data and about that drug approval, and because it was a statement about the fraudulent scheme that had been conducted. And I think there are approvals from FDA— And I don't want to get out ahead of the FDA here and speak out of turn beyond the brief, but approvals are for particular uses, for particular populations, for particular purposes. And so to the extent FDA and the drug sponsor here were engaged in an assessment of the appropriateness of this drug, it's not as if the approval is a single point-in-time determination. That's an exchange between the companies, the manufacturer of the drug, and the agency for determining the effectiveness and the safety of this drug for different populations. And so it's true that that drug is now available, and it's true that the drug company made the data available to FDA with and without the data from this VASC-3 study so that FDA could decide. But obviously, it can't be the case that the debarment provision doesn't apply if the company catches the problem and the lies at a clinical trial company, but does apply if the problem was—were never caught. Clearly, the debarment statute was written to cover all such scenarios because, as Chief Judge Pryor pointed out, it doesn't have any sort of temporal or causal limitation, and it uses the sort of more capacious language relating to. Let me ask one. So I think you've sort of—you've got kind of two arguments for how this conduct relates to—one is just it's a lie about something, and that's kind of was my hypothetical. That seems like a very broad argument. The second one is the idea that this was a lie to an FDA investigator who is investigating the approval process or investigating something to do with the development. Could you just—that second one, how does that match the text of the statute? Like just explain to me how that matches the text of the statute. I think Your Honor could deny the petition on either ground, but the way—on the second point, I think our—it's a very basic point that we are trying to make that the FDA inspection process itself is related to the development or approval of the drug because FDA's process of—you know, when it hears from a company, there are problems in our data, we're receiving bad data from this particular organization we're working with, we're concerned about the quality of that data, and FDA sends inspectors to go determine what's going on. That itself is part of drug development or approval. It's receiving information from companies like Laxo all the time. It needs to be able to assess the veracity of that and the quality of that data. And so that even though it's maybe considered after certain parts of the process, it still is a whole part of the development or approval process for FDA and from FDA's perspective. So then is it fair, to the extent I have a question for your friend on the other side, to say that while Ms. Palacio is focused on the 2011 approval, your position or the government's position is that these drugs are always in the approval process. They're always in the development process. So at no matter what point in time, it's still related to the development or approval. Yes and no, Your Honor. Yes, that's true in this particular case because we know that FDA and the company were engaged in this assessment about the safety and efficacy of this drug. That's why Glaxo had commissioned the study. That's all sort of part of the record here and part of the FDA's decision. I don't know if that's true of every single drug product, whether the approval process could be said to be ongoing sort of indefinitely, but it's certainly the case here. That's why FDA sent inspectors to find out what was going on. That's why Glaxo sent the data with and without the vestry study and data to FDA. There isn't some vast gap in time here between the time the study took place, the time of the investigation, the time of the conviction, and so on. So I think in this particular fact pattern, I think what Your Honor said is absolutely right. If Your Honors have no further questions, we'd rest in our brief. Thank you, Ms. Muthal. I'll just hear from Mr. Feldman. You've saved five minutes. Thank you, Your Honor. So Mr. Feldman, can you respond to the last point, which is that whereas you are encouraging us to focus solely on the 2011 approval, the government's position is that development and approval for this drug was ongoing? Well, under that premise, under that framework, when is a statement to the FDA about a clinical trial ever not related to development or approval of a drug? I mean, it's sort of, you run head-on to the problem that Judge Brasher— What if it is always? I don't think it is always. I think that you're— I mean, well, your rhetorical question just doesn't have much value for me. I don't understand. I'm not bothered by that possibility. I don't know what the problem is with that. So, to address your question, Judge Abudu, I don't think that it's a never-ending approval process. I think you've got to look at these things in phases, and you've got to look at the FDA process. They approved this drug for 4- and 11-year-olds in 2011. Then they decided to do—GSK decided to do a post-market study in 2015 for six months, which was the Vestry study, on its own to assess safetiness and effectiveness of the drug. And they hit their primary endpoint. And I don't think it's my colleague's fault, but quite frankly, some of these facts are a little mixed up. I've been in this case since 2019, so I feel like I have a good sense of the facts in this case. I represented Jessica Palacio. That inspection was not as a result of irregularities with respect to the clinical trial data. They actually purged that data in 2016, before she ever opened her mouth to the FDA investigators. That inspection was in connection with another study that Jessica Palacio was involved in that she was not charged with. But getting back to the issues at hand and whether or not you can sort of look at the 2016 safety and effectiveness study as part of the approval process, I think you've got to look at the plain meaning of the word approve and also look at the meaning of the word approve in the context of how the FDA operates. They've approved this drug. I think the better argument for the FDA is that it would fall under the development provision of that relating to development of a drug found at the mandatory debarment provision. But I still think they run into the same problem, that develop means what it says, which is to create or produce or bring into the market. It doesn't say advance. It doesn't say modify. It doesn't say assess. It doesn't say evaluate. It says develop. It doesn't say improve either. But even if you took the word improve in terms of develop, they're not the purpose of the statements impacted FDA in 2017. It would not be related to the improvement of the drug. They weren't seeking to improve it. They weren't seeking to say, hey, we want another version of this drug. We want Adverdiscus 2. They were just assessing and monitoring it. I do think that Judge Brasher's hypothetical is a real problem. I don't think that we're quite as far out here as that hypothetical, but we're pretty close because I think that if they'd come in, well, I'll just use Judge Brasher's example. I mean, I like that hypothetical because it shows that there really are no limitations to what type of conduct this relating to language could apply to, and I think that's the problem when you look at the arbitrary and capricious standard and whether or not the final order of debarment here was arbitrary and capricious or in accordance with the law. Looking at the plain text, the other thing is that 335A2A, which is the provision that she was debarred under. There's an A2B, and the A2B talks about undermining the drug regulation process. I'm not speaking to the merits of whether or not they would win on that one. I'm just saying if your honors set aside this final order, there's nothing to prevent the FDA from coming back, noticing Mrs. Palacio for final debarment under that provision, 335A2B, which seems to me even broader, and it would not necessarily be anchored to a relationship with either development or improvement of a drug. I have nothing further. Thank you so much for your time today. Thank you, Mr. Feldman. We're going to be in recess until tomorrow.